UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Cause No. 1:22-CR-00001-HAB-SLC |
| ) | |
| THARREN J. CALDWELL ) | |

**OPINION AND ORDER**

Defendant pleaded guilty to distributing a Schedule II controlled substance—methamphetamine—in violation of 21 U.S.C. § 841(a)(1). In the presentence investigation report ("PSR"), the probation officer included 226.8 grams of methamphetamine that Defendant negotiated and accepted payment for in their drug quantity calculation—even though those drugs were never delivered. Accordingly, the PSR held Defendant responsible for at least 150 grams but less than 500 grams of methamphetamine under U.S.S.G. § 2D1.1. Defendant objects to the inclusion of the 226.8 grams of undelivered product. This Court held an evidentiary hearing for this issue on May 25, 2023. (ECF No. 52).

Defendant also objected to the inclusion of three criminal history points in the PSR—one point for a possession of marijuana conviction and two additional points for being on probation at the time of his offense of conviction. Defendant contends that these criminal history points should not be included in light of recent amendments to the Federal Sentencing Guidelines effective November 1, 2023.[1] His objections are now fully briefed (ECF Nos. 57, 58, 62) and ripe for ruling.

**I.    Factual Background**

---

[1] When Defendant filed his objections, the relevant amendments to the Federal Sentencing Guidelines were not in effect. The amendments are now effective, so the Court need not address whether it should prospectively apply them. Thus, the amendments apply in Defendant's sentencing. *See United States v. Hathcoat*, 30 F.3d 913 (7th Cir. 1994) ("According to U.S.S.G. § 1B1.11, the 'court shall use the Guidelines Manual in effect on the date that the defendant is sentenced' unless doing so would violate the ex post facto clause of the Constitution of the United States.").

The investigation leading to Defendant's arrest consisted of two controlled buys and an additional attempted controlled buy. All the controlled purchases were conducted by either a confidential informant ("CI") or by undercover Fort Wayne Police Detective ("FWPD") Cameron Norris ("Norris").[2] Norris first learned of Defendant when the CI advised him that Defendant was dealing methamphetamine. (ECF No. 56 at 7).

The first controlled buy occurred in November 2020. (*Id.* at 9). The CI drove to Defendant's address where officers observed Defendant exit his residence and enter the CI's car. (*Id.* at 11). While in the car, Defendant sold the informant twenty-eight grams of methamphetamine in exchange for $600. (*Id.* at 11, 13).

In between the first and second controlled buys, Norris met with the CI to arrange a sale from Defendant directly to Norris. (*Id.* at 13). This time, Norris himself contacted Defendant via telephone and arranged to purchase two ounces of methamphetamine. (*Id.* at 13-14). Defendant had concerns that a new face would make his supplier nervous, so he instructed Norris to drop the money at Defendant's house and wait at a nearby gas station until his supplier delivered the narcotics. (*Id.* at 15). Defendant contacted Norris after this took place and Norris returned to Defendant's residence. (*Id.*) Defendant provided 52 grams of methamphetamine in exchange for $1300. (*Id.* at 14-15)

During this transaction, Defendant advised Norris that he had a secondary supplier that could provide Norris with pounds of methamphetamine. (*Id.* at 15-16). This conversation was audio recorded. (*Id.* at 17). In the audio recording, Defendant agreed to sell methamphetamine to Norris directly. (*Id.* at 18-20). His current supplier would provide methamphetamine for $7200 per pound. (*Id.*). But Defendant informed Norris that he could obtain a lower price from the secondary

---

[2] Norris has twelve years' experience with the Fort Wayne Police Department, including working as an undercover narcotics detective for seven years and participating in thousands of narcotics investigations. (ECF No. 56 at 6-7, 42).

supplier—$5600 per pound of methamphetamine—if Norris allowed Defendant to keep an ounce of methamphetamine for himself. (*Id.*).

After this interaction, Norris continued to discuss an additional transaction with Defendant. (*Id.* at 20-21). Defendant provided a variety of methamphetamine options, including three ounces for $525 each, seven ounces for $490 each, or eight ounces for $475 each. (*Id.* at 21). During discussions, Norris conducted a recorded telephone call with Defendant in December 2020. (*Id.* at 22-23). In the call, Defendant assured Norris that the drugs' quality would be "the exact same, if not better" and that the price would be lower for future transactions. (*Id.* at 23-24). And Defendant confirmed to Norris that the deal would take place and his source was trustworthy. (*Id.*)

The third buy was arranged on December 21, 2020, in which Norris was to purchase eight ounces of methamphetamine for $3800. (*Id.* at 25). Norris went to Defendant's residence where Norris gave Defendant the buy money. (*Id.*). Defendant then invited Norris inside.[3] (*Id.* at 26). Norris entered the residence where he observed an adult female, an adult male named Michael Jerome ("Jerome"), and at least one young child. (*Id.*). Defendant advised Norris that he would need to follow Jerome to another location to pick up the methamphetamine. (*Id.* at 27). Defendant counted the money and handed some of it to Jerome. (*Id.*). Defendant could not accompany Norris because he was still on home detention.

Norris obeyed Defendant's instructions and followed Jerome to another residence where officers observed Jerome Booker ("Booker") enter Jerome's car. (*Id.* at 29). Booker and Jerome then went into the residence. (*Id.* at 30). About ten minutes later, Jerome exited the residence, entered his vehicle, and quickly drove away. (*Id.*). No drugs were delivered.

---

[3] Norris believed that future transactions were a strong possibility due to Defendant's comfort in inviting Norris inside. (ECF No. 56 at 26).

3

Immediately following the failed transaction, other law enforcement officers conducted a traffic stop on Jerome. (*Id.* at 31). He told officers that when he went inside the residence to meet Booker, it looked abandoned as the back door was standing open. (*Id.*). Jerome believed his role in the sale was to provide Booker with the money and that Booker would bring the drugs outside to Norris. (*Id.*). Based on his observations, Jerome told officers that he believed Booker had ripped off Defendant. (*Id.* at 31-32). Law enforcement recovered $1,000 of pre-recorded buy money, with $980 being found on Defendant and the other $20 found on the female inside Defendant's residence. (*Id.* at 32). Law enforcement could not locate Booker following the incident.

After the attempted transaction, Defendant and Norris continued to communicate via text message. (*Id.* at 33). In one exchange, Defendant stated, "already fucked up and tried to get so much all at once and that dude, [Booker], took off with the money and they are looking for their money box." (*Id.* at 36). Later Defendant wrote, "[t]hey didn't get no product, because [Booker] took off with the money. He was robbing us, Bro, and they didn't know that." (*Id.* at 37).

In Norris' experience, multiple factors led him to believe Defendant intended to complete the third transaction and was also surprised that Booker stole the money without providing the narcotics. (*Id.*). Norris believed that if the plan is to steal from somebody, it is unusual to let that person know where you live beforehand and invite them inside. (*Id.* at 38). This is particularly true with Defendant, who was on home detention, and not likely to be going anywhere following the transaction. (*Id.*). This contrasts with how Booker completed the theft while using an abandoned residence. (*Id.*).

The PSR provided a detailed chronology of Defendant's criminal history for which the probation officer assigned twelve criminal history points establishing a criminal history category of V. (ECF No. 49). Pertinent here, the probation officer assessed Defendant one point for a 2018

conviction for Possession of Marijuana in Wabash, Indiana—Cause Number 85D01-1804-CM-414. (*Id.* at ¶ 63). Defendant had another nine points derived from other previous offenses. (*Id.* at ¶¶ 48-69). And two points were added because Defendant was under an Indiana criminal justice sentence for Nonsupport of a Dependent Child—Cause Number 92C01-1908-F6-805. (*Id.* at ¶ 71).

Defendant's base offense level was 32 because the PSR held him responsible for at least 150 grams but less than 500 grams of methamphetamine. (*Id.* at ¶ 37). After reductions for acceptance of responsibility, Defendant's total offense level was 29. (*Id.* at ¶¶ 44-46). With a criminal history category of V and an offense level of 29, the PSR provided an advisory guideline range of 140 months to 175 months imprisonment. (*Id.* at ¶ 108).

## II.     Legal Discussion

### A. Drug Quantity Objection

Under U.S.S.G. §1B1.3(a)(2), all acts that were part of the same course of conduct or common scheme or plan as the offense of conviction are to be considered "relevant conduct." "Types and quantities of drugs not specified in the count of conviction may be considered in determining the offense level." U.S.S.G. § 2D1.1 n.5 (citing U.S.S.G. §1B1.3(a)(2)). And the Court may consider the "price generally obtained for the controlled substance, financial or other records, and similar transactions in controlled substances by the defendant… Unless the sale is completed, the agreed-upon quantity shall be used to determine the offense level." *Id.*

The Sentencing Guideline § 2D1.1 Application Note adds that:

> [If] the defendant establishes that the defendant did not intend to provide a purchase or was not reasonably capable of providing or purchasing the agreed upon quantity of the controlled substance, the Court shall exclude from the offense level determination the amount of the controlled substance that defendant establishes that defendant did not intend to provide or purchase or was not reasonably capable of providing or purchasing.

5

*Id.* The Government must prove the factual finding of drug quantity by a preponderance of the evidence under the sentencing guidelines. *United States v. Bozovich*, 782 F.3d 814, 817 (7th Cir. 2015).

To that end, the Government agues that Defendant seriously intended to deliver eight ounces of methamphetamine to Norris. As such, they posit that the 226.8 grams of methamphetamine from the attempted transaction should be included in Defendant's drug quantity calculation for sentencing. Defendant counters that he never intended to provide Norris with narcotics and, in any event, was incapable of doing so as he was on home detention. Yet Defendant's argument rests vastly on his own word. And the Government has provided ample evidence that Defendant was serious in his attempt to sell eight ounces of methamphetamine to Norris on December 21, 2020. The Government has met its burden and the 226.8 grams of methamphetamine from the attempted transaction will be included in Defendant's relevant conduct.

The sentencing guidelines require the Court to exclude the attempted transaction if "the defendant establishes that the defendant did not intend to provide a purchase or was not reasonably capable of providing or purchasing the agreed upon quantity of the controlled substance." U.S.S.G. § 2D1.1 n.5. Drug-quantity calculations are "not an exact science." *United States v. Sewell*, 780 F.3d 839, 849 (7th Cir. 2015); *See also Bozovich*, 782 F.3d at 818 ("Determining drug quantities under the Sentencing Guidelines is often difficult, and district courts may make reasonable though imprecise estimates based on information that has indicia of reliability."). And a sentencing judge "may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come…provided that the information has [a] sufficient indicia of reliability to support its probable accuracy." *United States*

*v. Hankton,* 432 F.3d 779, 789 (7th Cir.2005) (citing *United States v. Lemmons*, 230 F.3d 263, 267 (7th Cir.2000)). A district court need find only that the defendant was reasonably capable of producing the negotiated amount. *United States v. Jean*, 25 F.3d 588, 599 (7th Cir. 1994).

The evidence here is this. Defendant arranged the attempted transaction after extensive discussions with Norris regarding price per ounce, the quality of the product, and the trustworthiness of his source. Such dealings demonstrate the seriousness of Defendant's intent. *See United States v. Cea,* 963 F.2d 1027, 1031 (7th Cir. 1992), *cert denied*, 506 U.S. 899 (1992). Defendant refused to name his source which implied that he believed the individual was worth protecting. In a phone call just days before the attempted transaction, Defendant assured Norris that the deal would take place and Defendant described having completed similar transactions with the secondary supplier previously. *See United States v. Salazar*, 983 F.2d 778, 783 (7th Cir. 1993) ("Here the district judge was well within the bounds of reason in taking [Defendant] at his word as to his ability to deliver the goods.")

Defendant then invited Norris into his home to conduct the final portion of the transaction—a bizarre decision if his aim was to steal from Norris. Once the theft occurred, Defendant felt comfortable to tell Norris who the supplier was indicating that Defendant's trust had been violated and that he was also a victim of Booker. And Defendant's messages to Norris after the theft demonstrate that he had no idea Booker would run off with the money.

After Norris provided the money to Defendant, Defendant kept $1000 of the $3800 and gave the remaining $2800 to his roommate Jerome. After Booker took the $2800 from Jerome, police pulled Jerome over. Notably, Jerome did not have any of the cash on hand and Booker was never located following the incident.

Defendant does not come without explanation for much of these events. He posits that the arrangement was a planned theft all along. Indeed, the actual events deviated from the plans that Norris and Defendant discussed beforehand, which he believes shows that the transaction was a sham. And the events track Count 4 of Defendant's indictment (ECF No. 1 at 4) that charges him with theft of $3800 on December 21, 2020. Defendant also notes that the previous transactions were for a lesser quantity—one or two ounces rather than eight. And he views the text messages to Norris following the transaction as a mere attempt to cover his tracks.

This Court doubts that where an arranged transaction ends in theft, the actual transaction would ever go according to the plans beforehand. Again, Defendant solely relies on his word without pointing to anything more. And the mere fact the previous successful transactions were for a lesser quantity provides little weight for the assertion that Defendant could not provide greater quantities. This is especially true when considering the menu of options for drug price and quantity that Defendant provided Norris.

The authority that Defendant cites in support of the drugs' exclusion is readily distinguishable. Defendant starts with *United States v. Ruiz,* 932 F.2d 1174 (7th Cir. 1991). There, the Seventh Circuit reversed the inclusion by the district court of 10 kilograms of narcotics because it found that the defendant did not intend to produce nor was he reasonably capable of producing the negotiated amount. *Id.* at 1183. Yet the district court included the evidence based on a single statement—"even ten more I can get"—which hardly represented the negotiation of a specific drug transaction. *Id.* at 1184. No price had ever been set or quoted and there was no evidence that the defendant had access to the amount of narcotics he boasted about getting. *Id.* Whereas here, Defendant negotiated the price for various quantities of methamphetamine, vouched for the quality and trustworthiness of his supplier, and accepted money toward the transaction.

Defendant finishes with *United States v. Moon*, 926 F.2d 204 (2d Cir. 1991). In that case, the Second Circuit found that conversations and negotiations could not sustain the inclusion of drugs where none were delivered. *Id.* at 208-10. Even so, *Moon* dealt with a situation in which the defendant negotiated prices for a kilogram of cocaine from two different sellers, but ultimately purchased from only one seller. *Id.* at 209. Here, Defendant may have negotiated a price with his first supplier, but clearly switched to acquire the same drugs from Booker. The attempted transaction differs from the un-attempted transaction in *Moon* because that defendant simply opted not to buy the drugs from one of the sellers. As for Defendant, he accepted cash for the attempted transaction and took major steps to actually facilitate it.

The Government has met its burden that the drugs from the attempted transaction should be included in Defendant's relevant conduct. From the evidence presented, this Court is satisfied that Defendant intended to deliver 226.8 grams of methamphetamine to Norris on December 21, 2020. Thus, the increased drug quantity will be considered for sentencing and Defendant's objection is overruled.

### B. Criminal History Objection

On November 1, 2023, several amendments to the Federal Sentencing Guidelines became effective which Defendant believes warrants removal of three criminal history points. If Defendant is correct, then his criminal history score would be nine—giving him a criminal history category of IV and, consequently, a lower advisory guideline range. Two of the Sentencing Commission's amendments are relevant to Defendant's objection.

The first concerns Defendants 2018 conviction for Possession of Marijuana, for which the probation officer assessed one criminal history point. (ECF No. 49, ¶ 63). "If reliable information indicates that the defendant's criminal history category substantially over-represents the

9

seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted." U.S.S.G § 4A1.3(b)(1). Note 3 of U.S.S.G § 4A1.3 now suggests a potential downward departure where a defendant has a prior conviction for possession of marijuana:

> (A) Examples. —A downward departure from the defendant's criminal history category may be warranted based on any of the following circumstances:
>
>> (i) The defendant had two minor misdemeanor convictions close to ten years prior to the instant offense and no other evidence of prior criminal behavior in the intervening period.
>>
>> (ii) The defendant received criminal history points from a sentence for possession of marihuana for personal use, without an intent to sell or distribute it to another person.

U.S.S.G. § 4A1.3 n.3. Contrary to Defendant's stance, the amendments do not appear to eliminate the criminal history point for Defendant's marijuana conviction; they pose a potential consideration for a departure from the sentencing guidelines under limited circumstances. A departure is a matter for the Court to consider at sentencing, not a proper objection to the PSR.

Still Defendant believes such a departure is warranted under the circumstances. Under 18 U.S.C. §3553, the Court may consider the defendant's history in determining whether a departure may be warranted. True, Defendant's 2018 conviction was for simple possession. (ECF No. 49, ¶ 63). Yet that does not tell the whole story. Though his arrest in Cause Number 85D01-1804-CM-414 resulted in his guilty plea for simple possession, Defendant, at the time of his arrest, admitted to officers that he was dealing marijuana as well. (*Id.* at ¶ 64). And he continued to participate in criminal behavior between his conviction and his arrest for the instant federal offense, both by obtaining new charges for Nonsupport of a Dependent Child in Cause Number 92C01- 1908-F6-805 and using controlled substances while on home detention. (*Id.* at ¶¶ 65-68). Thus, this Court

cannot say that the "defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." U.S.S.G § 4A1.3(b)(1). Considering Defendant's admission to dealing marijuana during his 2018 arrest and his subsequent conduct, no downward departure is warranted.

The other amendment concerns the probation officer's addition of two criminal history points for a defendant who commits the instant offense while under a criminal justice sentence. (ECF No. 49, ¶ 71). Although Defendant committed his offense of conviction while under a criminal justice sentence for Nonsupport of a Dependent Child, the criminal history calculation was made under the previous version of the Sentencing Guidelines. *See* U.S.S.G § 4A1.3(d) (2022) ("Add 2 points if the defendant committed the instant offense while under any criminal justice sentence, including probation, parole, supervised release, imprisonment, work release, or escape status.").

The instructions for applying points to a defendant who committed their charged offense while under a criminal justice sentence is now found at U.S.S.G §4A1.1(e) of the amended Sentencing Guidelines. Under U.S.S.G §4A1.1(e), in determining the defendant's criminal history category, "[a]dd 1 point if the defendant (1) receives 7 or more points under subsections (a) through (d), and (2) committed the instant offense while under any criminal justice sentence, including probation, parole, supervised release, imprisonment, work release, or escape status." U.S.S.G §4A1.1.

Defendant here (1) has 10 criminal history points under subsections (a) through (d) and (2) committed the instant offense while under a sentence for Nonsupport of a Child. (ECF No. 49, ¶¶ 48-69). The amendment works in Defendant's favor insofar as it supports the addition of only one

criminal history point instead of the two assessed in the PSR. (ECF No. 49, ¶ 71). Yet it does not alter Defendant's criminal history category of V or his advisory guideline range.

A defendant's criminal history category is V if his criminal history points total ten, eleven, or twelve. U.S.S.G §5A. Defendant has ten criminal history points under U.S.S.G §4A1.1(a)-(d). Adding the one point under subsection (e) gives Defendant eleven total points. With eleven total criminal history points, Defendant's criminal history category remains at V.[4] Although Defendant's objection brings his criminal history points down to eleven from twelve, it does not change his guideline imprisonment range.

### III. Conclusion

For these reasons, Court SUSTAINS IN PART Defendant's objections (ECF No. 45) to the extent that the Court finds that the PSR should be revised to reflect that Defendant has eleven criminal history points. Defendant's objections are OTHERWISE DENIED.

SO ORDERED on December 12, 2023.

        s/ Holly A. Brady
        JUDGE HOLLY A. BRADY
        UNITED STATES DISTRICT COURT

---

[4] The Court notes that even if it found that one point should not be applied to Defendant's 2018 possession of marijuana conviction, Defendant's criminal history score would be nine and one point would be added under U.S.S.G § 4A1.1(e), resulting in a total criminal history score of ten. Therefore, his Criminal History Category would remain a V.